**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **CENTENNIAL HEALTHCARE** | ) | **Case Nos. 02-_____ through 02-_____** |
| **CORPORATION, *et al*.,** | ) | |
| | ) | **Jointly Administered** |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF DAVID R. WILSON
IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS**

I, David R. Wilson, hereby state and declare as follows:

1.      I am the Chief Executive Officer of Centennial HealthCare Corporation, one of the debtors in these Chapter 11 bankruptcy cases.  I make this Declaration in support of the motions and applications of Centennial HealthCare Corporation and its debtor affiliates (collectively, the "Debtors") filed herewith.  The facts set forth in this Declaration are personally known to me, and, if called as a witness, I could and would testify thereto.

**Background**

2.      The Debtors provide a broad range of long-term care services to meet the medical needs of elderly and post-acute patients.  The Debtors currently own, lease, and/or manage 86 skilled nursing facilities with approximately 9,500 licensed available beds, providing basic and specialty healthcare services in 19 states and the District of Columbia.  In addition, the Debtors provide comprehensive rehabilitation services, home healthcare services, nurse practitioner services, and administrative and management services.  Finally, the Debtors provide certain

ATL_IMANAGE-3067215

administrative services (primarily accounting, payroll, marketing, and human resources) to 56 facilities in Florida.

3.      Following their founding in 1989, the Debtors generally pursued a strategy of growth through acquisitions.  Debtor Centennial HealthCare Corporation ("Centennial") conducted an initial public offering of its common stock in July 1997.  However, the Debtors' growth strategy was impeded in the late 1990s by several factors, including changes in Medicare reimbursement rules, an increase in the price of potential acquisitions, and changes in the capital markets.

4.      In October 1998, Centennial entered into a merger agreement with Welsh, Carson, Anderson & Stowe VI, L.P. ("Welsh Carson").  The proposed merger was terminated by Welsh Carson in April 1999, after the Debtors received an investigatory subpoena from the United States Department of Health and Human Services relating to allegations of improper claims for payment under the Medicare program.

5.      In March 2000, a subsidiary of Debtor Hilltopper Holding Corporation ("Hilltopper"), Hilltopper Acquisition Corporation ("Acquisition"), commenced a tender offer for the outstanding common stock of Centennial.  At the time of this tender offer, Hilltopper was wholly owned by affiliates of Warburg, Pincus & Co. ("Warburg").  Following the conclusion of the tender offer, Acquisition merged into Centennial, Centennial became a wholly-owned subsidiary of Hilltopper, and Centennial's stock was no longer publicly traded.  In connection with this transaction, several members of Centennial's management and several affiliates of Welsh Carson became preferred stockholders of Hilltopper.  Warburg remained the majority shareholder of Hilltopper.

6.      The Debtors are parties to, and (other than Hilltopper) are borrowers under, the Amended and Restated Credit Agreement among the Debtors, Wachovia Bank, National Association, as administrative agent, Bank of America, N.A., as syndication agent, and the several lenders from time to time party thereto, dated as of July 31, 1998, (as amended, the "Credit Agreement").  The Credit Agreement provides for the revolving loans and the issuance of letters of credit.  As of the Petition Date, the Debtors were liable in respect of loans made pursuant to the Credit Agreement in the aggregate principal amount of approximately $68,921,689.89 (plus interest accrued but unpaid thereon), and the Debtors were contingently liable in the aggregate amount of $10,159,689.00 in respect of letters of credit issued pursuant to the Credit Agreement that remained undrawn as of the Petition Date.

7.      The Debtors also are parties to a participation agreement and related documents dated July 29, 1998 with Bank of America, N.A. and other lenders (collectively, as amended, the "Lease Financing Facility").  The Lease Financing Facility provides for availability of up to $113,500,000 for the purposes of acquisition, development, and construction of facilities leased by the Debtors and expires on July 29, 2003.  As of the Petition Date, the Debtors' exposure under the Lease Financing Facility was not less than $127,631,343.25 of principal (plus an additional amount of interest paid "in kind") and $1,114,232.89 of accrued and unpaid interest (other than any interest paid "in kind").

8.      The Debtors' obligations under the Credit Agreement and the Lease Financing Facility are secured by liens on and security interests in substantially all of the Debtors' assets.

9.      Beginning on December 31, 2001 and continuing into 2002, the Debtors failed to comply with certain payment obligations and financial covenants under the Credit Agreement and the Lease Financing Facility.  Since that time, the Debtors have had difficulty paying all of

their debts as they have become due.  The Debtors have replaced several members of their senior

management team with individuals who have substantial experience in workouts and

restructurings in the long-term care industry.

10.     Because of defaults under the Credit Agreement and the Lease Financing Facility

and cash-flow concerns, the Debtors have concluded, after consultation with their advisors, that

their interests and the interests of their creditors, patients, and employees will be best served by a

reorganization under Chapter 11 of the Bankruptcy Code.

### Additional Time for Schedules and Statements

11.     Due to the substantial size of the Debtors and the complexity of their operations,

the Debtors will be unable to compile all the information necessary for the preparation and filing

of schedules and statements of financial affairs within 15 days after the Petition Date, as required

by Bankruptcy Rule 1007(c).

12.     To prepare the schedules and statements, the Debtors must gather information

from books, records, and documents housed at various locations and relating to a multitude of

transactions.  Consequently, collection of the necessary information requires the expenditure of

substantial time and effort on the part of the Debtors' already over-burdened employees.

Employee efforts during the initial stages of these bankruptcy cases are critical and should be

focused on attending to the Debtors' businesses and operations to maximize the value of the

Debtors' estates.  Several employees are currently working diligently to assemble and collate the

necessary information.  The Debtors will need a minimum of 90 days within which to prepare

and file their schedules and statements of financial affairs in the appropriate format.

## **Payroll and Related Employee Obligations**

13.      As of the Petition Date, the Debtors employ approximately 11,500 individuals

who care for their patients and provide the requisite financial and administrative support services

that the Debtors require for their operations.  The long-term success of these operations depends

on the Debtors' ability to maintain its current experienced workforce.  However, merely because

of the timing of the Petition Date, a portion of salary and benefits owed to employees that accrue

daily are pre-petition obligations.  The financial hardship to employees that would result if the

Debtors are unable to satisfy these pre-petition obligations would sorely prejudice these

employees and, consequently, jeopardize the Debtors' ability to keep their workforce intact and

maintain the smooth functioning of their business operations.

14.      Approximately 10,200 of the Debtors' employees are paid on an hourly basis, bi-

weekly or semi-monthly, and the remainder are paid a salary bi-weekly or semi-monthly.  The

Debtors' monthly payroll is approximately $19.5 million.  The aggregate payroll amount

includes any bonuses, commissions, relocation pay, and overtime pay remitted to the various

employees.

15.      The Debtors' payrolls are paid on different days of the week, depending on the

particular employer and location of an individual employee's work.  As of the Petition Date, the

Debtors' payrolls were substantially current as to payment, but each Debtor's payroll includes a

period of arrearage.  As a result of the timing of the Debtors' Chapter 11 filings, the Debtors'

salaried and hourly employees are owed salary and wages on account of what now constitutes

pre-petition services.  The Debtors estimate that such amounts do not exceed $9 million.  It is the

Debtors' belief that no employee's unpaid pre-petition salary or wages exceeds the $4,650

threshold provided in Section 507(a)(3) of the Bankruptcy Code.

16.     Employees who do not receive direct deposits have been issued checks for pay periods ending prior to the Petition Date, and such checks may not have cleared as of the Petition Date.  Included in the aforementioned gross payroll amounts are the employees' contributions to various retirement and other employee benefit plans and programs provided by the Debtors and the Debtors' portion of payroll taxes, as well as union dues for unionized employees.

17.     To maintain the loyalty of the Debtors' employees, it is essential to fulfill the obligations arising from certain employee benefit programs.  The Debtors have established a variety of employee benefit plans and policies, including medical, dental, vision, prescription drug, life insurance, disability, 401(k), vacation pay, sick pay, holiday pay, tuition reimbursement, and employee assistance benefits (collectively, the "Benefit Obligations").  Full-time employees and, for certain Debtors, part-time employees working 16 hours or more per week are entitled to participate in the programs described below.

(a)     Medical, Dental, Vision, and Prescription Plans: The Debtors make available to their employees comprehensive medical, dental, vision, and prescription plans.  The net monthly cost to the Debtors of these plans is approximately $1,130,000.

(b)     Life Insurance:  The Debtors provide their employees with basic life insurance coverage and accidental death/dismemberment and dependent life insurance coverage.  The net monthly cost to the Debtors of these plans is approximately $37,000.

(c)     Disability Plans:  The Debtors provide their employees with short-term and long-term disability plans. The plans are insured through several carriers.  The net monthly cost to the Debtors of these plans is approximately $46,000.

(d)     401(k) Employer Contributions:  The Debtors maintain five "401(k)" retirement plans for the benefit of their employees.  Like most companies, the Debtors

provide matching contributions to the employees' 401(k) plans. The Debtors' employer contribution equals 15% of the first 4% of an employee's contribution.  The Debtors accrue the plan costs on a monthly basis, estimated to be approximately $7,500 per month.

(e)     Vacation, Sick, and Holiday Pay:  The Debtors' employees are entitled to a specified number of paid vacation days, sick days, and holidays based on a sliding scale.  The number of days is tied to years of service.

(f)     Tuition Reimbursement Program:  The Debtors' employees may request reimbursement of tuition, up to $1,000 per year, for vocational or college-level courses directly relating to enhancing performance in a current position or future advancement. The net monthly cost to the Debtors of this program is approximately $3,000.

(g)     Employee Assistance Program:  The Debtors maintain an Employee Assistance Program that provides corporate employees assistance on such issues as substance abuse, behavioral health, and financial or legal advice.  This program is part of the Debtors' life-insurance program and does not involve any additional cost to the Debtors.

(h)     Health and Dependent Care Flexible Spending Program:  Certain Debtors provide health and dependent care flexible spending accounts in accordance with a cafeteria plan.  The Debtors pre-fund these accounts at the beginning of each calendar year based on employees' stated intent to contribute, and the Debtors are repaid by employee payroll deductions throughout the year.  The net monthly administrative cost to the Debtors of these programs is $5.25 per participant.

18.      Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed employees for certain business expenses necessarily incurred in the scope of their employment. Due to the timing of the submission and processing of reimbursement requests, the total amount of such expenses that are outstanding as of the Petition Date cannot be estimated accurately.  Historically, however, such expenses have averaged approximately $300,000 per month and have included, among other things, business related travel expenses, business meals, car rentals, and a variety of miscellaneous expenses (collectively, the "Business Expense Obligations").  All Business Expense Obligations were incurred by employees on the Debtors' behalf in connection with employment by the Debtors and in reliance upon the Debtors' reimbursement policy, so it is important to reimburse the business expenses in order to maintain the loyalty of the employees.

**Critical Trade Vendors**

19.      Certain vendors supply essential goods and services to the Debtors.

20.      Support from Critical Vendors on an ongoing basis is vital to the Debtors' reorganization.  At this precarious stage in the Debtors' business operations, an interruption in the supply of goods or services provided by the Critical Vendors would have a severely negative impact on the Debtors' efforts to rehabilitate and reorganize.

21.      For example, some of the essential functions and goods provided to the Debtors by Critical Vendors include, but are not limited to, food and beverages; oxygen and respiratory supplies; medical supplies; laboratory services and x-rays; agency staffing; and dieticians.

22.      The Debtors' senior management has analyzed the Debtors' sources of supply to determine which suppliers are essential to the Debtors and could create a business interruption if

they were to refuse to supply goods or services to the Debtors.  The Debtors have undertaken the following process:

(a)     The Debtors have identified suppliers of goods and services without which the Debtors would suffer a significant business disruption and have determined whether these suppliers are parties to executory contracts with the Debtors.

(b)     The Debtors have attempted to locate alternative suppliers willing to do business with the Debtors on comparable pricing and credit terms.

(c)     The Debtors have considered whether these alternative suppliers would be in a position to replace the Debtors' current vendors without a significant service interruption.

(d)     Any supplier that (i) is not a party to a long-term executory contract that is capable of assumption by the Debtors, and (ii) cannot be replaced by the Debtors without either a significant service interruption or an extraordinary price increase is a potential Critical Vendor.

23.     As of the Petition Date, the Debtors owed a total of approximately $3,400,000 to the Critical Vendors.

24.     Without a seamless continuation of the goods and services provided by the Critical Vendors after the Petition Date, the Debtors would experience significant decreases in revenue and a notable degradation in the quality of services the Debtors provide to their customers and patients.

**Post-Petition Financing**

25.      The Debtors require financing to conduct their post-petition operations and are

unable to obtain sufficient credit on an unsecured basis.  The DIP Lenders and the Debtors are

presently in discussions regarding a longer term post-petition financing facility.  However, given

the Debtors' current cash needs, the DIP Lenders have agreed, following substantial and arms'-

length negotiations, to provide the DIP financing to the Debtors.  The Debtors anticipate that

they will seek approval for a longer term post-petition financing facility on or before January 6,

2003.

26.      The Debtors and the DIP Lenders have negotiated the terms of the DIP financing

in good faith and at arm's length.  The proposed DIP financing represent the Debtors' best

opportunity to obtain adequate post-petition working-capital financing necessary to fund the

Debtors' operations in bankruptcy.  This financing is essential to provide the Debtors with

sufficient liquidity to continue to operate their businesses as going concerns and will enable the

Debtors to fund the actual and necessary costs and expenses of preserving their estates.  Absent

an alternative source of working capital, the Debtors do not have sufficient liquidity from the use

of cash collateral to carry on the operations of their businesses.  The proposed DIP financing will

provide funds necessary for the Debtors to maintain business relationships with their vendors and

suppliers, to purchase necessary provisions, to pay employees, to care for patients, and otherwise

to finance their operations until such time as a longer term post-petition financing can be

negotiated and implemented.

27.      The Debtors do not have financing available from other sources on equally

favorable terms.  Because the Debtors' assets are fully encumbered by the liens and security

interests of the DIP Lenders, as well as those held by parties to the Lease Financing Facility, and

because of the immediate and critical need for financing,  the Debtors face a very limited pool of potential lenders willing to provide a facility of the size and scope necessary to preserve the Debtors' operations.  The Debtors believe that the DIP financing offered by the DIP Lenders is the Debtors' best source of post-petition financing, and that the terms of the DIP financing are fair and reasonable and in the best interests of the Debtors' estates.

28.    The Debtors have an immediate need for post-petition financing.  Without immediate authority to obtain a portion of the DIP financing offered by the DIP Lenders, the Debtors will be unable to meet ongoing operational expenses.

## **Cash Collateral of Real Estate Lenders**

29.    Certain of the Debtors own skilled nursing facilities that are financed in part under credit facilities other than the Credit Agreement and the Lease Financing Facility. Individual Debtors are parties to the following agreements and instruments:  (a) a Promissory Note dated October 28, 1994, made by Debtor Transitional Health Partners to SouthTrust Bank of Alabama, National Association ("SouthTrust") in the original principal amount of $5,000,000, due July 1, 2002 and extended to December 31, 2002; (b) a Promissory Note dated December 22, 1995, made by Debtor Oak Grove of Rutherford Limited Partnership to NationsBanc Mortgage Capital Corp. ("NationsBanc") in the original principal amount of $3,000,000, with principal due on January 1, 2003, such promissory note assigned by NationsBanc to Midland Loan Services ("Midland"); (c) a Promissory Note dated July 21, 1995, made by Debtor Parkview Partnership to NationsBanc in the original principal amount of $3,850,000, due August 1, 2002, as modified by that certain First Modification to Promissory Note dated August 28, 1995, and by that certain Second Modification to Promissory Note dated September 6, 1995, such promissory note

assigned by NationsBanc to Midland; (d) a Revolving Credit Note dated May 30, 2002, made by

Debtors Jennings Property Services Company, LLC and Jennings Nursing Home Investors, LLC

to Heller Health Care Finance, Inc. ("Heller") in the original principal amount of $500,000; (e) a

Term Note dated May 30, 2002, made by Debtors Jennings Property Services Company, LLC

and Jennings Nursing Home Investors, LLC to Heller in the original principal amount of

$4,880,000; and (f) a Purchase Money Promissory Note dated March 31, 1995, made by Debtor

Transitional Health Partners to Health Care Property Investors, Inc. ("HCPI").  HCPI,

SouthTrust, Heller, Midland, and NationsBanc are referred to herein collectively as the "Real

Estate Lenders."

30.     The Real Estate Lenders assert first priority security interests in and liens upon all

rents, revenues, income, proceeds, profits, and security ("Income") derived from the operation of

certain of the Debtors' owned skilled nursing facilities.

31.     The Debtors do not have sufficient unencumbered cash or other assets with which

to continue to operate their businesses absent use of the Income.  The Debtors' use of Income

from each facility to pay operating expenses, including, but not limited to, payroll, taxes,

maintenance, insurance, and other expenses of operation and administration of each patient care

facility, is necessary for an effective reorganization.

32.     The Debtors have agreed, as adequate protection for the use of the Income, the

use, sale, lease, depreciation, decline in market price, or other diminution in value of the

collateral of each Real Estate Lender (including the Income), and the imposition of the automatic

stay (the amount of any such diminution being referred to hereinafter as the "Real Estate Lender

Adequate Protection Obligations") to provide to each Real Estate Lender to secure the Real

Estate Adequate Protection Obligations owing to that Real Estate Lender by the Debtor liable to

such Real Estate Lender, a security interest in and lien upon the Income of that Debtor generated by the relevant Facility after the Petition Date.

## Cash Management and Bank Accounts

33.     The Debtors' ability to continue and maintain their consolidated cash management system and existing bank accounts is essential to the efficient administration of the Debtors' estates and is necessary to prevent inordinate disruption to the Debtors' operations. Maintenance of the Debtors' cash management system and existing bank accounts is also essential to the Debtors' ability to fund their existing payroll and to implement their proposed debtor-in-possession financing arrangements, all of which are critical components of the Debtors' efforts to reorganize.

34.     The Debtors are in the process of transitioning their cash management system from SunTrust Bank to Bank of America.  However, the Debtors will not be able to complete the transition and establish new bank accounts for a short period after the Petition Date.

35.     The Debtors' ability to use their current payroll and operating checks, bank accounts, existing stationery, and other business forms during the pendency of these Chapter 11 cases without alteration or change is necessary to prevent inordinate and unnecessary disruption and expense to the Debtors' business operations.

36.     Dismantling the cash management system or altering it significantly would cause immeasurable harm to the Debtors' ability to efficiently and effectively manage their cash, accounting functions, and operations, and would create disruptions in the timely receipt of cash collections from customers and the payment of post-petition obligations, which would have a significant adverse effect on the Debtors' operations.

37.     The Debtors maintain a variety of zero-balance accounts into which revenues from patients, insurance companies, and government insurance programs are deposited. Substantially all of these revenues are transferred daily by wire transfer or automated clearing house transfer to a Central Funding Account in the name of Debtor Centennial HealthCare Management Corporation.

38.     Most of the Debtor's disbursements for payroll, accounts payable, and other expenses are drawn on zero-balance controlled disbursement accounts.  As checks are presented against these accounts, funds are transferred from the Central Funding Account in amounts sufficient to permit these checks to be honored.

39.     Certain of the Debtors, including Carebridge, Inc. and Centennial Professional Therapy Services Corporation, have separate disbursement accounts for their payrolls.  These accounts are pre-funded from the Central Funding Account prior to the presentment of checks against them.  The Debtors' corporate payroll also is pre-funded into a separate account.

40.     Three additional Debtors, Total Care, Inc., Total Care of the Carolinas, Inc., and Paragon Rehabilitation, Inc., maintain separate funding and zero-balance disbursement accounts. These accounts function in a manner similar to the accounts of Centennial HealthCare Management Corporation described above.

41.     The Debtors also maintain several stand-alone accounts that are not regularly swept into the Central Funding Account, including accounts for liability claims, petty cash, and certain other purposes.

42.     The Debtors manage certain nursing facilities for the benefit of other non-debtor owners (the "Non-Debtor Facilities").  The Debtors maintain separate bank accounts relating to the Non-Debtor Facilities (the "Non-Debtor Accounts").  Although the Non-Debtor Accounts are

technically included in the Debtors' present cash management system, none of the funds in the Non-Debtor Accounts are commingled with the Payroll Accounts or the General Operating Accounts.

43.     The Debtors maintain regular and detailed records of all transfers among the various accounts described above.

44.     Prior to the Petition Date, funds in the Debtors' Central Funding Account were held by SunTrust Bank overnight prior to disbursement to other accounts as needed on the next business day.

## Obligations to Patients

45.     The relationship between the Debtors and their patients is vital to the success of the Debtors' businesses.  Patients and their families need to be assured that they will not be adversely affected and that the care for the patients being provided in the Debtors' facilities will not be disrupted by the Debtors' filing for bankruptcy.

46.     In the ordinary course of operating their health care businesses, the Debtors are subject to federal and state regulations pertaining to the funds of patients and follow certain practices and policies regarding (i) the prompt refund of patient payments in the event of overpayment; and (ii) funds held in trust for patients (collectively, the "Patient Trust Fund Policies").  These actions are necessary to maintain regulatory compliance.

47.     Pursuant to ordinary business practices in the health care industry, the Debtors' Facilities require private-pay patients to pay each month's bill, and Medicaid patients to pay each month's Patient Medicaid Liability, for services and/or residential facilities in full in advance at the start of the month.  These monthly fees are deposited in each Facility's depository account

and the funds subsequently transferred into a concentration account.  In cases where patients are discharged from a Facility before the end of the month, the applicable Debtor credits the patient or his or her responsible party with a pro-rated amount for the portion of the month during which the patient no longer received services (the "Prepayment Refund").

48.     The Prepayment Refund is required by federal and/or state law for patients who are Medicare or Medicaid recipients.  For private patients, the Prepayment Refund is required by the standard admission agreement signed between each Facility and the patient.  Prepayment Refunds not only are required by regulations and contract but also maintain the goodwill of patients and their families.

49.     Similarly, patients may overpay amounts that the Facilities subsequently repay pursuant to either regulatory requirements or the Debtors' ordinary business practices (an "Overpayment Refund").  Medicaid regulations require Overpayment Refunds in the case of Medicaid recipients.

50.     In addition, in the ordinary course of their businesses, the Debtors receive security deposits (the "Security Deposits") from private patients, which may be applied to the patients' obligations to the Debtors or returned to the patients, as appropriate.

51.     Applicable federal law and regulations require that each of the Facilities operated by the Debtors hold and administer the funds that its patients receive as income (whether from government or private sources) in an interest-bearing account ( a "Patient Trust Fund Account").

52.     A Patient Trust Fund Account has been established for each nursing center at a bank geographically proximate to the particular Facility.  Each Patient Trust Fund Account is segregated from the Debtors' other accounts.  The Debtors have posted surety bonds in the

aggregate amount of $2,701,000 to secure their obligations to turn over trust funds to their patients. These surety bonds are secured by cash collateral in the amount of $250,000.

53.     As funds from Social Security, Supplemental Security Income, private pension funds and other funds flow to the Debtors on account of the patients, these funds are placed into the Patient Trust Fund Account. The patients' Social Security checks are (a) sent to the patient's responsible party either in form of a cash payment or deposited into the Patient Trust Fund Account, (b) sent to the Facility in the name of the Patient (if the patient is cognizant) and either deposited into the patient's personal account or the Patient Trust Fund Account or (c) sent to the Facility in the name of the administrator of the Facility, who endorses the check and deposits it in the Patient Trust Fund Account. When a patient's charges are payable, the Facility bookkeeper writes a check out of the Patient Trust Fund Account to the Facility for the amount of each Patient's charges incurred at the Facility.

54.     The Debtors' Patient Trust Fund Account procedures are conducted in the ordinary course of their businesses and pursuant to regulations. These procedures are also subject to Medicaid audit by state regulatory officials. As of the Petition Date, approximately $1,600,000 was held in Patient Trust Fund Accounts.

55.     It is critical that the Debtors be permitted to continue, in their discretion, the practices and policies described above in order to comply with applicable regulatory requirements, maintain the confidence of the patients and avoid creating undue concern on their part, and maintain revenues through patient satisfaction.

**Sales and Use Taxes**

56.     The Debtors collect and incur various taxes, including state and local sales and use taxes, in the ordinary course of their businesses.   Before the Petition Date, the Debtors paid their tax obligations in a timely fashion.

57.     Sales and use taxes accrue as goods are sold and are calculated based upon varying percentages depending on the jurisdictions involved.  In some cases, sales and use taxes are paid in arrears after they are collected by the Debtors.  The aggregate monthly amount of sales and use taxes paid by the Debtors is approximately $9,000.

58.     Many, if not all, of these taxes constitute so-called "trust fund" taxes, which are required to be collected from third parties and held in trust for payment to the taxing authorities.

59.     Paying these taxes on time will minimize or avoid significant administrative difficulties, a marked increase in audits by taxing authorities, and a flurry of tax lien filings.

**License and Regulatory Agency Fees**

60.     In the ordinary course of their businesses, the Debtors are regulated by various regulatory agencies in the states in which the Debtors operate their facilities and other businesses (collectively, the "Regulatory Agencies").  Each year, the Debtors are required to pay yearly fees to the Regulatory Agencies to remain in good standing to operate their facilities.  In addition, the Debtors are required to pay license fees and other levies and taxes to the Regulatory Agencies for the licensing of their facilities and other operations and for authority to conduct business in particular jurisdictions.  In a calendar year, these regulatory fees (the "Regulatory Fees") total less than $100,000 in the aggregate.

61.     The Debtors are routinely current on such fees.  Nonetheless, because of the timing of the filing and payment period in which payment must be made for assessed Regulatory Fees, a portion of the Regulatory Fees may be billed or accrued prior to the Petition Date but have not yet reached the payment due date.  Moreover, it is possible that the Debtors may be notified by such agencies in the future that they must satisfy obligations for any such pre-petition obligations.

62.     It is essential to the operation of the Debtors' facilities and other operations that government agencies do not revoke or refuse to renew any of the Debtors' business licenses and certifications.

## Utilities

63.     Utility services are essential to the Debtors' ability to sustain their operations while these Chapter 11 cases are pending.  In the normal conduct of their businesses, the Debtors have relationships with approximately 300 utility companies for the provision of telephone, electric, gas, water, sewer, waste management, internet access, and other services.

64.     Any interruption of utility service to the Debtors' businesses would be severely disruptive and diminish the Debtors' chances for a successful reorganization.  In particular, if local utility providers were permitted to terminate or disrupt service to the Debtors, the Debtors' central-office operations would be paralyzed, and the health and welfare of the Debtors' patients could be seriously jeopardized.  A loss of utility service could lead licensing bodies to close the Debtors' facilities and transfer patients elsewhere, thereby severely hampering the Debtors' reorganization prospects.

65.     Certain Utility Companies provide the Debtors with services necessary to run their day-to-day office operations.  For example, the Debtors are highly computerized and extremely reliant on electrical service for their continued operation.  The Debtors are dependent upon internet and telephone service to maintain their ability to send and receive electronic communications and records.

66.     The facilities owned and operated by the Debtors require a full complement of utility services for the health, safety, and welfare of patients and staff.  No skilled nursing facility could hope to remain in business without heat in the wintertime or electric, water, and trash service at any time of year.

67.     The Debtors have posted deposits with several of the Utility Companies to ensure the Debtors' payment obligations.

### Setoffs by Certain Payors

68.     Pursuant to government programs, private insurance, medical and health plans, various payors (the "Payors") pay the Debtors for the services which the Debtors provide to patients covered by such programs or plans.  Collectively, the Debtors derive approximately 90% of their revenues from payments made by the Payors.  Thus, any disruption in such payments could have a serious, adverse impact on the Debtors and on their ability to provide quality care to the thousands of patients who rely on the Debtors for care and basic necessities of living on a daily basis.

69.     Medicaid and Medicare revenue are paid pursuant to contracts, agreements, and other arrangements between the Debtors and certain governmental units or certain fiscal intermediaries and agents, insurance plans, and health maintenance organizations, pursuant to

which the Debtors have agreed to provide services to patients, and the Payors have agreed to pay the Debtors for the services provided.  Because such payments are necessary to the Debtors' ability to provide services, such Medicare and Medicaid payments are made periodically to the Debtors and are followed by a payment reconciliation process in certain circumstances to determine the exact amounts owed for the Debtors' services.

70.     Continuing the normal reconciliation process for current periods may reduce the risk of attempts by Payors to interrupt payments, and help preserve the relationship between the Debtors and the government agencies that provide the bulk of their revenues.

## Insurance Programs

71.     In the ordinary course of their businesses, the Debtors maintain liability and property insurance polices, which provide the Debtors with insurance coverage relating to, among other things, professional/general liability, workers' compensation, employment practices, business automobile, directors and officers liability, occupational injury, fiduciary duties, crime, business interruption, boiler and machinery, flood, and property.

72.     The Debtors are required to pay premiums based upon a fixed rate established by each Insurance Carrier.  The premiums for most of these policies are determined annually and are paid by the Debtors at policy inception directly to the Insurance Carrier.

73.     The Debtor's largest premiums are for their professional/general liability coverage.  The Debtors pay a down payment on these policies and then pay the remainder in installments.

74.     As of the Petition Date, the Debtors believed that they were current on pre-petition premiums with respect to the Insurance Programs, with the exception of their workers'

compensation program.  With respect to workers' compensation, the Debtors owe a payment of $476,745 to Royal & Sun Alliance Insurance Company.

75.     The Debtors' professional/general liability insurance programs include self-insured retentions that require the Debtors to pay directly to the claimants all claim amounts up to the Debtors' retention amount for each claim, as set forth in the policy language.  If the claim amount to be paid is in excess of the self-insured retention amount, the Debtors pay their portion of the claim (as set forth in the policy) to a third-party administrator that collects the balance of the amount to be paid from the Insurance Carrier and then pays the full claim amount to the claimant.

76.     With respect to other insurance policies, there are certain deductible amounts set forth in the policy language for each claim.  Claims for losses and expenses are paid by the Insurance Carriers directly to claimants, attorneys, investigators, and health care providers, as incurred.  The Insurance Carriers then bill the Debtors for reimbursement of losses and expenses that fall under the deductible amounts set forth in the policy.

77.     Paying expenses such as attorneys' fees and costs of investigation that may fall within the self-insured retention or deductible under the Debtors' insurance policies is necessary to continue to address and process claims.

78.     To reduce the amount of premiums paid by the Debtors and to facilitate insurance operation, the Debtors employ a professional third-party administrator, Caronia Corporation (the "TPA"), to administer their professional/general liability claims.  There are currently less than 100 active professional/general liability suit files.  The TPA handles initial intake of an average of 100 claims per month.  The TPA performs general administration and claims adjustment

services for the Debtors, including, but not limited to, administration, investigation, and settlement negotiations.  The TPA administers claims for both current and prior policy periods.

79.     American International Specialty Lines Insurance Company, the Debtors' professional/general liability insurance policy carrier in most states, requires the Debtors to employ a third-party administrator.  At the beginning of each policy period, the TPA requires the Debtors to deposit a certain sum of money, which the TPA then uses to set up various accounts. The TPA uses the funds placed in these accounts to pay monthly expenses, which include attorney, investigation, and other loss adjustment expenses.

80.     The TPA bills the Debtors for its expenses on a monthly basis in order to replenish the minimum funds in each of the existing accounts.  As of the Petition Date, the average monthly payment the Debtors made to the TPA was $100,000 per month.

81.     The TPA is paid $150,000 per year in equal installments of $12,500 per month for claims-handling services.

82.     The Debtors employ a TPA, Benefit Planners, Ltd., to administer the medical and dental claims for the self-insured plans of Debtors Centennial HealthCare Corporation, Paragon Rehabilitation, Inc., Total Care Consolidated, Inc., and Total Care, Inc.  The TPA also handles data-management services related to posting deductions on employee checks as well as compiling and paying additional benefit carriers for Centennial HealthCare Corporation, including life insurance, disability, and an outside health maintenance organization.

83.     Benefit Planners, Ltd. is paid on a per-employee, per-month basis.

84.     In all states in which the Debtors operate, financial guaranty, surety, or performance bonds are required for licensure to operate a nursing home.  The Debtors maintain

numerous bonds, including financial guaranty, surety, performance, and other miscellaneous

bonds (the "Outstanding Bonds").

85.     The Outstanding Bonds can be drawn down by a creditor in the event the Debtors

default on payment to such creditor or misadminister funds in patient trust accounts.

86.     The Debtors also maintain a few miscellaneous bonds, including bonds on

potential legal judgments, notary bonds, completion bonds, and maintenance bonds for local

townships that guarantee that the Debtors' facilities meet aesthetic community standards.  Some

miscellaneous bonds are generally maintained for a limited period and are for small dollar

amounts.

87.     The Debtors have approximately $2,700,000 in Outstanding Bonds.  The

aggregate of annual premiums for these bonds is approximately $45,000.

88.     West Bend Mutual Insurance Company ("West Bend") is the surety company

with which the Debtors currently place the majority of their bonds.  The premiums for the bonds

are determined annually at the time of bond renewal, or at the time a new bond is placed.

89.     To maintain certain of the Outstanding Bonds, the Debtors were required to

provide West Bend with cash collateral in the amount of $250,000 as security for certain

obligations to West Bend to satisfy claims made with respect to the surety bonds.

90.     As of the Petition Date, the surety companies have contingent claims against the

Debtors in the amount of approximately $2,700,000.  This amount may increase or become fixed

in part when the bonds are renewed or if certain creditors become entitled to an increase in their

existing bonds.  Failure to pay any pre-petition or post-petition amounts due and owing with

respect to the Outstanding Bonds will trigger West Bend's right to claim the cash collateral

provided for its benefit and will affect the Debtors' ability to renew the Outstanding Bonds.

**Retention of King & Spalding**

91.     King & Spalding has been the Debtors' principal outside counsel for more than

five years and has been providing restructuring advice to the Debtors for several weeks.

92.     The Debtors have selected King & Spalding as their attorneys because of the

firm's extensive knowledge of the Debtors' businesses and financial affairs, its general

experience and knowledge, and its recognized expertise in the field of debtors' protections,

creditors' rights, and business reorganizations under Chapter 11 of the Bankruptcy Code, as well

as in other areas of law related to these bankruptcy cases, such as healthcare law, litigation, and

regulatory matters.  King & Spalding has the necessary background to deal effectively with

many of the potential legal issues and problems that may arise in the context of the Debtors'

bankruptcy cases.  The Debtors believe that King & Spalding is both well qualified and uniquely

able to represent them in these cases in a most efficient and timely manner.

**Continued Engagement of Conway, Del Genio, Gries & Co., LLC**

93.     In recognition of their need for sound restructuring advice, the Debtors, among

other things, sought to retain a firm with substantial experience in the reorganization and

restructuring of companies in financial distress.  As a result of the expertise and successful

history of Conway, Del Genio, Gries & Company, LLC ("CDG") in providing restructuring

advisory services to other companies in financially complex, troubled situations similar to the

Debtors' situation, the Debtors selected CDG to provide services to them.

94.     CDG is currently staffing the engagement with five CDG employees – Robert P.

Conway, Michael P. Monaco, a senior managing director, M. Benjamin Jones, a vice president

and two CDG staff, all of whom acted in an advisory capacity to the Debtors prior to the Petition
Date.

96. In contemplation of a possible bankruptcy filing, the Debtors requested that CDG
make Mr. Conway available to serve as the Debtors' Chief Restructuring Officer.  The
Engagement Letter further provides that other CDG employees will be placed with the Debtors
and become officers upon the parties' mutual agreement.  Specifically, CDG will make Messrs.
Monaco and Jones available to serve as Vice Presidents of Restructuring for the Debtors during
these reorganization cases.  Additional CDG staff will be made available to serve as Assistant
Treasurers for the Debtors during these reorganization cases.

96. The Debtors agreed to compensate CDG at the rate of $150,000 per month, plus
out-of-pocket expenses and a restructuring fee.

## Retention of Trumbull Services, LLC

97. Although the Debtors have not yet filed their schedules of assets and liabilities,
they anticipate that there will be thousands of entities that the Debtors will be required to serve
with various notices, pleadings, and other documents filed in these cases.  Considering the
number of anticipated claimants and parties in interest and the nature of the Debtors' businesses,
the Debtors believe that the appointment of Trumbull Services, LLC ("Trumbull") will expedite
the distribution of notices, relieve the Clerk's office of the administrative burden of processing
such notices, and permit the Debtors to focus on their reorganization efforts.

98. In addition, in connection with any plan of reorganization proposed by the
Debtors, the Debtors have determined that they will require the services of Trumbull with respect

to the mailing of the Debtors' disclosure statement, plan, and ballots and in maintaining and tallying ballots in connection with the voting on such plan.

### Ordinary Course Professionals

99.    As noted above, the Debtors maintain substantial operations in various locations within the United States.  As a result, prior to the Petition Date, the Debtors used certain professionals (the "Ordinary Course Professionals") to provide professional services required on a day-to-day basis to manage the Debtors' affairs.

100.    The Debtors desire to continue to employ the Ordinary Course Professionals to render services to their estates similar to those services provided prior to the Petition Date. These services include (a) tax preparation and other tax advice; (b) legal services with regard to (i) routine litigation, (ii) collection matters, (iii) reimbursement and regulatory matters, (iv) acquisitions, divestitures, and other corporate matters, and (v) real estate issues; and (c) other relatively minor matters requiring the expertise and assistance of professionals.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 20th day of December, 2002, at Atlanta, Georgia.

/s/ David R. Wilson
David R. Wilson
Chief Executive Officer
Centennial HealthCare Corporation